# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs February 4, 2013

## IN RE: KRISSA E. M. L.

**Appeal from the Juvenile Court for Sevier County**
**No. 11001892     Jeff Rader, Judge**

**No. E2012-01938-COA-R3-PT-FILED-FEBRUARY 28, 2013**

The guardian ad litem for the minor child Krissa E. M. L. ("the Child") filed a petition in the Juvenile Court for Sevier County ("the Juvenile Court") seeking to terminate the parental rights of Lanesha L. ("Mother") to the Child. The State of Tennessee Department of Children's Services ("DCS"), which already had been involved with the Child's case through dependency and neglect proceedings, was named in the petition and supported the prosecution of the petition. After a trial, the Juvenile Court terminated Mother's parental rights to the Child after finding that grounds for termination pursuant to Tenn. Code Ann. §§ 36-1-113 (g)(1), (g)(2), and (g)(3), had been proven by clear and convincing evidence, and that clear and convincing evidence had been shown that it was in the Child's best interest for Mother's parental rights to be terminated.[1] We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and JOHN W. MCCLARTY, J., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Lanesha L.

Robert E. Cooper, Jr., Attorney General and Reporter; and, Jordan Scott, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

Guardian Ad Litem, Robert L. Huddleston.

---

[1]The Juvenile Court also terminated the parental rights of David B., the Child's father, to the Child. David B. is not a party on appeal, and we do not address the termination of his parental rights.

**OPINION**

**Background**

The Child was born in May 2008. In July 2010, the Child was placed in the custody of DCS by order of the Juvenile Court. Mother and the Child had been living with the Child's great-grandmother, now deceased. In November 2010, the Juvenile Court adjudicated the Child dependent and neglected, and specifically referenced Mother's addiction to oxycodone and opiates in its order as a basis for its determination. In March 2011, a permanency plan was ratified which required Mother to do the following: 1) maintain stable housing; 2) complete parenting classes; 3) seek employment; 4) complete an alcohol and drug assessment and follow all recommendations; 5) submit to random drug screens; 6) complete a mental health assessment; and, 7) resolve pending legal issues.

In November 2011, Robert L. Huddleston, guardian ad litem for the Child, filed a petition seeking to terminate Mother's parental rights to the Child. Mr. Huddleston alleged four grounds for termination of parental rights against Mother: failure to support; failure to provide a suitable home; substantial noncompliance with permanency plan; and, persistent conditions. Mr. Huddleston also alleged that it was in the Child's best interest that Mother's parental rights to the Child be terminated. Mother answered the petition in opposition. In July 2012, this case was tried.

Mother testified. Mother stated that she lived in Sevierville and that she was the biological mother of the Child. Mother testified that the Child entered DCS custody based upon phone calls to DCS stating that Mother was using drugs. When DCS personnel arrived at Mother's house, they asked Mother if she was using drugs and Mother admitted that she was. Mother specified that the "drugs" in question were oxycodone.

Mother testified extensively about her drug use and history. Mother, age 21 at trial, began using drugs at age 14. Mother stopped using drugs when she realized she was pregnant. Upon giving birth, Mother was prescribed Percocet 10 and she fell back into drug addiction. Oxycodone and marijuana were Mother's drugs of choice. Mother asserted that she had suffered setbacks since then, such as through using marijuana and by failing a drug screen. Mother testified that she completed inpatient drug treatment at New Life Lodge with aftercare for six months, four days a week. Mother further testified that, through New Life Lodge, she had completed her alcohol and drug assessment. Mother stated that her participation in her aftercare was one reason she could not get a job in order to pay child support. Mother acknowledged that she failed two drug screens after having completed the program. Mother, however, stated that two other ostensibly failed drug screens were inaccurate because, according to her, they showed positive results for drugs she had never

used, like methamphetamine. Mother testified regarding whether she persevered in her sobriety:

> At this point, yes. I mean I have had some setbacks and I'll admit to that, but I'm still going to NA classes, I work six days a week. I mean I don't have time to do nothing else; come home, go to bed, and get back up at 4 o'clock in the morning and go back to work. Even my grandmother passing away - - and that's one thing that throws me back into drugs, and I'm still doing fine.

Mother further testified that she completed a mental health assessment at Helen Ross McNabb.

Elaborating on her failed drug screens, Mother stated that she failed a drug screen for marijuana and benzodiazepine after her stay at New Life Lodge. However, Mother stated that she had a prescription for the benzodiazepine. Mother acknowledged that she refused to take a drug screen within one week of trial. Mother attempted three different drug treatment centers in 2010 but failed. Mother repeated that she suffered "some setbacks." Mother failed drug screens in January and April 2012, and October 2011, after having completed New Life Lodge. Mother testified that she attended five rehabs before successfully completing one, the sixth, at New Life Lodge. Continuing with her testimony, Mother stated that her relapses were with marijuana, but that she would never take another oxycodone. Mother was an IV user when the case began, and her arms looked like "a railroad track had been driving up and down them . . . ." Mother attended NA meetings each week. Mother disagreed with the April 2012 drug screen failure for marijuana and oxycodone, testifying that "I haven't touched oxycodone in over a year." In January 2012, Mother tested positive for oxycodone, opiates, and marijuana.

Regarding child support, Mother acknowledged that she failed to pay support for the Child in the four months leading up the filing of the petition to terminate parental rights, but stated that it was because she was doing what DCS wanted her to do in securing drug treatment. Mother briefly had a job at Loco Burro in Gatlinburg but ended up losing it because she went to jail in November 2011 to finish her sentence from an earlier criminal matter. Mother testified that she also worked for an "air brusher" at different times over the years, but that DCS did not consider this a legal income. In sum, Mother acknowledged that in the 24 months her case involving the Child had been ongoing, she was employed in a "legal job" for five months. Mother stated that her child support obligation was $330 per month. From March through November 2011, Mother made no child support payments. Mother suffered from no disabilities that prevented her from working. Mother stated that she earned about $900 per month at Hardee's. While Mother admitted that she was aware of her duty to provide child support, she explained that she did not pay child support as ordered

because she was "trying to focus on completing my rehab." Mother, however, stated that she had given the Child a few gifts at times, such as a doll and some clothes.

Regarding the permanency plan, Mother stated that she completed parenting classes and now held a job at Hardee's in Pigeon Forge, where she had worked for some three months. Mother also stated that she had resolved all pending legal charges against her, followed the rules of probation, and did not incur any more charges. Nevertheless, Mother still owed fines totaling at least $3,000 from various criminal matters.

With respect to residences, Mother lived in a number of places after the removal of the Child. Mother stated that she lived in a trailer with a five-year lease that she could have so long as she made the $300 per month rent payment. Mother had lived at her current address since April 2012. Before that, Mother lived with a friend for six months. Mother lived "here and there" for about six months prior to that. Before that, Mother lived in a motel in Gatlinburg for five months. Mother stated that she did not know where she lived before that. In all, Mother acknowledged living in three or four different places in the 24 months before trial.

As to the future, Mother testified to her long-term plans:

If my rights aren't terminated, like I said I'm training now to be a crew trainer and then within three months, I'll be a shift leader and then on up to management with Hardee's. When they hired me on, that's what I hired on for was to do that.

I plan on to keep working, to keep my home, get my license back. I've done been working on that. I'm trying to make some payments. I'm just a little tight on money at the moment . . . So I'm just trying to provide her a normal life, you know. I've been going to church a little bit too, you know, on my days off and stuff.

Lori Armstrong ("Armstrong"), a FSW for social services at DCS, testified. Armstrong worked on the Child's case since the Child entered custody in 2010. Armstrong testified to an incident whereby she conducted a surprise visit to see the Child, who was then staying at her great-grandmother's house. By court order at the time, Mother was not to be at the house when the great-grandmother was with the Child. In a bedroom, Armstrong saw a male asleep in bed. Armstrong then saw Mother hiding under a towel in the bathroom with her face covered. This incident occurred in October 2011. Armstrong stated that, broadly, the major obstacles in this case were Mother's instability and drug use. According to Armstrong, Mother told her that she did not require any help finding housing.

Armstrong further testified to various efforts DCS had made to assist Mother. DCS assisted Mother in finding proper parenting classes. DCS administered drug screens for Mother, and discussed drug treatment facilities with her. Armstrong testified to her efforts to visit and inspect Mother's residences. Regarding Mother's most recent residence, Armstrong testified that she had not yet verified that the previous tenant had moved out, but that the residence basically was appropriate.

Bill H. ("Foster Father") testified. Foster Father, a retired police officer, worked for Kroger in its loss prevention division. The Child had lived in the home of the Foster Father for about three months. Foster Father testified that he and his wife could financially support the Child. Foster Father had two other foster children. Foster Father testified that he was open to adoption of the Child should she be placed in full guardianship of DCS.

In August 2012, the Juvenile Court entered its Termination of Parental Rights and Final Decree of Full Guardianship, terminating Mother's parental rights and awarding custody of the Child to DCS.[2] In its decree, the Juvenile Court stated, in relevant part:

> By clear and convincing evidence the Court also finds that [Mother] provided no support during the relevant four (4) month time period. The petitioner entered into evidence proof that [Mother] had signed the criteria for termination of parental rights and also entered into evidence a copy of her payment history with the Department of Human Services. [Mother's] counsel entered into evidence a recent payment history which shows a payment made in the past week – but that did not occur in the relevant four (4) month time period. There was testimony that [Mother] is able-bodied and capable of taking care of herself and providing support. There was no evidence that she is disabled. **By clear and convincing evidence, the requirements of Tenn. Code Ann. § 36-1-113 (g)(1) and § 36-1-102 (1)(A)(i) have been met** . . . .
>
> ***
>
> By clear and convincing evidence the Court also finds that [Mother] has not substantially fulfilled the requirements of her permanency plan. The Court finds that [Mother] has completed a drug treatment and that she claims this met

---

[2]The Juvenile Court identified the foster father as one David W. However, from the transcript, the foster father's name is Bill H. It appears from the record that David W. was involved in the case at one point. We do not believe this discrepancy in names materially alters the judgment of the Trial Court, or is dispositive to any issue on appeal.

the goal of the permanency plan. However, the Court notes that she has continued to fail drug screens and that she should not be given credit for completing that step because she has not maintained sobriety. The Court further finds that [Mother] has continued to move around and has not found stable housing as required by the permanency plan. The Court finds that the permanency plan was reasonably related to the issues that brought the child into the state's custody. Finally, on the subject of reasonable efforts, the Court finds that under these circumstances, the Department did all that it could have done in this context. **By clear and convincing evidence, the requirements of Tenn. Code Ann. § 36-1-113 (g)(2) and § 37-2-403 (a)(2) have been meet** . . . .

\*\*\*

By clear and convincing evidence the Court also finds that [Mother] has failed to provide a suitable home. The Court finds that [Mother] has lived in several residences throughout the time that the child has been in custody and that she cannot provide a stable living environment. The Court also finds that her most recent bout of stability before the date of trial was of no consequence because the Court is bound to look at the time before the filing of the petition to terminate parental rights. As previously stated regarding reasonable efforts, the Court finds that the Department did all that it could have done in this context. **By clear and convincing evidence, the requirements of Tenn. Code Ann. § 36-1-113 (g)(1) and § 36-1-102 (1)(A)(ii) have been met** . . . .

\*\*\*

By clear and convincing evidence the Court also finds that [Mother] has not remedied the conditions that led to the child's removal. The Court finds that the child entered the state's custody because [Mother] admitted to using Oxycodone by needle. The Court finds that, despite completing an alcohol and drug assessment and treatment as ordered in the permanency plan, [Mother] has continued to fail her drug screens at the Department of Children's Services; she disputes the results of these drug screens, but the Court finds that there is no evidence in the record to suggest that these screens are inaccurate. The Court finds to the contrary, because the drugs that [Mother] tested positive for in January and April of 2012 are the very drugs she was using at the time of the child's removal. As previously stated regarding reasonable efforts, the Court finds that the Department did all that it could have done in this context.

**By clear and convincing evidence, the requirements of Tenn. Code Ann. § 36-1-113 (g)(3) have been met** . . . .

\*\*\*

The Court took sworn testimony from DCS case manager, Lorrie Armstrong, who testified that [Mother] has continued to fail drug screens during the time that the state had custody of her child. She testified that she provided [Mother] with the criteria for termination of parental rights and that [Mother] knew of her obligation to support the child. She also testified that [Mother] has lived in multiple locations. Ms. Armstrong further testified about the drug screens and stated that she informed [Mother] about her right to get another drug screen and informed her of where she could do this . . . .

The Court also heard testimony from [Mother]. In her testimony, [Mother] admits that she has setbacks and that she has had trouble with her drug problems. Although [Mother] disputed the results of the drug screens in January and April of 2012, she offered no rebuttal proof other than her word and the Court did not find her testimony convincing without further offers of proof. She also testified that she had not paid child support during the four months before the filing of the petition – although she had provided some support for the child in recent months and in February 2011. [Mother] also verified that she had been staying in several different places, testifying that she had lived in three or four different places in two years.

The Court finally took testimony from David [W.], one of the child's resource parents. Mr. [W.] testified that he and his wife wished to adopt the child and that they wanted to provide for her in their home.

The Court finds, by clear and convincing evidence, that it is in [the Child's] best interest for [Mother's] . . . parental rights to be terminated. **By clear and convincing evidence, and pursuant to Tenn. Code Ann. § 36-1-113 (i), the Court finds that it is in the best interest of the child to terminate [Mother's] parental rights** . . . .

Mother appeals to this Court.

**Discussion**

Though not stated exactly as such, Mother raises five issues on appeal: 1) whether the Juvenile Court erred in finding and holding that clear and convincing evidence existed to terminate her parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) for willful failure to provide support; 2) whether the Juvenile Court erred in finding and holding that clear and convincing evidence existed to terminate her parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) for failure to provide a suitable home; 3) whether the Juvenile Court erred in finding and holding that clear and convincing evidence existed to terminate her parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(2) for substantial noncompliance with permanency plan; 4) whether the Juvenile Court erred in finding and holding that clear and convincing evidence existed to terminate her parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(3) for persistent conditions; and, 5) whether the Juvenile Court erred in finding by clear and convincing evidence that it was in the Child's best interest for Mother's parental rights to be terminated.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208,

31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We first address whether the Juvenile Court erred in finding and holding that clear and convincing evidence existed to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) for willful failure to provide support. In pertinent part, Tenn. Code Ann. § 36-1-113 (g) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113 (g)(1) (Supp. 2012). As pertinent to this appeal, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

\* \* \*

(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child;….

Tenn. Code Ann. § 36-1-102 (1) (2010).

We have discussed the willful character of abandonment for failure to support:

This court has consistently held that the term willfulness as it applies to a party's failure to support a child must contain the element of intent. *In re Swanson*, 2 S.W.3d 180, 188–89 (Tenn. 1999). Indeed, "defining abandonment as the mere non-payment of support [is] unconstitutional because this language creates an irrebuttable presumption of abandonment, irrespective of intent." *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003) (citing *In re Swanson*, 2 S.W.3d at 188). The element of intent utilized in termination proceedings "does not require the same standard of culpability as is required by the penal code." *In re Audry S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id*. "[A] person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id*. at 863–64. Additionally, " '[f]ailure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support.' " *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005) (quoting

-10-

> *In re Adoption of T.A.M.*, No. M2003–02247–COA–R3–PT, 2004 WL
> 1085228, at *4 (Tenn. Ct. App. May 12, 2004)).

*In re Dylan H.*, E2010-01953-COA-R3-PT, 2011 WL 6310465, at *6 (Tenn. Ct. App. Dec. 16, 2011), *no appl. perm. appeal filed*.

The evidence in the record on appeal is clear that Mother did not pay child support as ordered in the relevant four month time frame as required under the statute.[3] On appeal, Mother argues that she was occupied with an aftercare program so as to comply with the terms of her permanency plan and therefore she did not willfully fail to pay child support. We do not agree with this argument. First, we note Mother's testimony that she was aware of her duty to support the Child, and that she had no disability to prevent her from working. Second, Mother's drug treatment, while laudable, presents no valid justification for failing to provide any child support in the relevant period. Finally, Mother actually did hold legitimate employment at a restaurant for about two months before the petition to terminate parental rights was filed, and yet Mother still failed to provide any child support in the relevant period.

Mother's contention that she was focused on her rehab, which was indeed a necessary and important endeavor, nevertheless fails to absolve her of her duty to pay child support. From our review of the record before us, we find that the Juvenile Court's findings made under the clear and convincing standard as relevant to the issue of willful failure to support are supported by a preponderance of the evidence. The Juvenile Court did not err in finding and holding that clear and convincing evidence existed that grounds were proven to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113 (g)(1) for willful failure to support.

We next address whether the Juvenile Court erred in finding and holding that clear and convincing evidence existed to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) for failure to provide a suitable home. As pertinent to this issue, Tenn. Code Ann. § 36-1-102 provides:

> (ii) The child has been removed from the home of the parent(s) or
> guardian(s) as the result of a petition filed in the juvenile court in which the
> child was found to be a dependent and neglected child, as defined in § 37-1-

---

[3]From the record, it appears that Mother was incarcerated as of November 15, 2011 and remained in jail for a short period thereafter. The petition seeking to terminate parental rights was filed on November 18, 2011. We accordingly adjust the relevant four month frame of time relative to this issue. However, given the facts of this case, the adjustment does not yield any dispositive result.

102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parents(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2010).

From the record before us, it is apparent that Mother lived in at least three to four different locations after the removal of the Child. Mother's residential history is a rocky one. From the time of the Child's removal, Mother has moved relatively frequently, including spending months in a motel and also simply living "here and there." Mother obtained her own housing some three months before trial, but this late effort will not suffice under the relevant statutory ground. Mother did not cooperate with DCS as she could and should have in securing stable housing after the removal of the Child.

From our review of the record before us, we find that the Juvenile Court's findings made under the clear and convincing standard as relevant to the issue of failure to provide a suitable home are supported by a preponderance of the evidence. The Juvenile Court did not err in finding and holding that clear and convincing evidence existed that grounds were proven to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113 (g)(1) for failure to provide a suitable home.

We next address whether the Juvenile Court erred in finding and holding that clear and convincing evidence existed to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113 (g)(2) for substantial noncompliance with permanency plan. In pertinent part, Tenn. Code Ann. § 36-1-113 (g)(2) provides that termination of parental rights may be based upon the grounds that: "There has been substantial noncompliance by the parent or guardian with the statement of responsibilities

in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4 . . . ." Tenn. Code Ann. § 36-1-113 (g)(2) (Supp. 2012). *See* Tenn. Code Ann § 37-2-403 (a)(2). Our Supreme Court has stated with respect to this ground for termination of parental rights:

> Substantial noncompliance is a question of law which we review de novo with no presumption of correctness. Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." *Black's Law Dictionary* 1428 (6th ed.1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement. Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant.

*In re Valentine*, 79 S.W.3d at 548-49.

From the record, it appears that Mother did comply with certain portions of her permanency plan, such as securing an alcohol and drug assessment. The major deficiencies in Mother's adherence to her parenting plan are in the areas of housing and drug abuse. While Mother apparently undertook several steps to address her drug problem, she nevertheless continued to fail drug screens. Mother challenges the accuracy of some, but not all, of these drug screens. Nevertheless, we observe, as did the Trial Court, that there is nothing to undermine the validity of these tests in the record save for Mother's word. Therefore, the clear evidence is that Mother has persisted in abusing drugs, which, despite her stints in rehab, goes against the fundamental spirit and goal of the permanency plan. Regarding housing, we already have discussed Mother's unstable residential background.

From our review of the record before us, we find that the Juvenile Court's findings made under the clear and convincing standard as relevant to the issue of substantial noncompliance with permanency plan are supported by a preponderance of the evidence. The Juvenile Court did not err in finding and holding that clear and convincing evidence existed that grounds were proven to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113 (g)(2).

We next address whether the Juvenile Court erred in finding and holding that clear and convincing evidence existed to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(3) for persistent conditions. In pertinent part,

Tenn. Code Ann. § 36-1-113(g)(3) provides that termination of parental rights may be based upon the grounds that:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
>     (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
>     (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
>     (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2012).

> As this Court has held:
>
> "[A] parent's continued inability to provide fundamental care, even though not willful, whether caused by mental illness, mental impairment, or some other cause, constitutes a condition which prevents the safe return of the child to the parent's care. Where, as here, efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified."

*In re T.S. and M.S.*, M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000), *Rule 11 appl. perm. appeal denied December 11, 2000*.

Mother's continued use of drugs, the original problem necessitating the removal in the first place, is the primary issue related to this ground. On appeal, Mother's main argument appears to be that the drug screens are an inadequate basis from which to draw conclusions, and actually are "mere speculation." As already discussed, we see nothing in the record to undermine the accuracy or validity of these drug screens, despite Mother's protestations. Without more on which to rely, it would be much more speculative for us to ignore the drug screens evidenced in the record without some substantive basis.

-14-

From our review of the record before us, we find that the Juvenile Court's findings made under the clear and convincing standard as relevant to the issue of persistent conditions are supported by a preponderance of the evidence. The Juvenile Court did not err in finding and holding that clear and convincing evidence existed that grounds were proven to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113 (g)(3).

Finally, we address whether the Juvenile Court erred in finding by clear and convincing evidence that it was in the Child's best interest for Mother's parental rights to be terminated. As pertinent to this issue, Tenn. Code Ann. § 36-1-113 (i) provides:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113 (i) (Supp. 2012).

The Child's life with Mother sadly has not involved much stability. Mother's drug abuse problems have proven a persistent obstacle to her exercising the role of a mother. While we acknowledge certain late efforts by Mother to improve her situation such that she could be a fit parent to the Child, these efforts are insufficient and far past due. The Child, now in a suitable pre-adoptive home, deserves stability and predictability in her life. The evidence in the record on appeal does not preponderate against the Juvenile Court's findings made by clear and convincing evidence that it is in the Child's best interest for Mother's parental rights to be terminated. We affirm the Juvenile Court's finding that it is in the best interest of the Child for Mother's parental rights to be terminated.

We find and hold that the Juvenile Court did not err in terminating Mother's parental rights to the Child. We, therefore, affirm the Juvenile Court's judgment terminating Mother's parental rights to the Child.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, Lanesha L., and her surety, if any.

_____
D. MICHAEL SWINEY, JUDGE